# Richmond

## George E. Mann v. W. C. Crenshaw and Company, Incorporated.

March 24, 1932.

Present, Campbell, C. J., and Holt, Epes, Hudgins and Browning, JJ.

The opinion states the case.

*J. H. Rives, Jr.*, and *William T. Muse*, for the plaintiff in error.

*Thomas A. Williams* and *L. C. O'Connor*, for the defendant in error.

EPES, J., delivered the opinion of the court.

This controversy grows out of the shipment in February, 1927, by George E. Mann, trading as George E. Mann and

Company, of ten carloads of lettuce, each containing 320 crates, from Imperial Valley, California, to W. C. Crenshaw & Company, Incorporated, a commission merchant, Richmond, Virginia, to be sold upon consignment.

George E. Mann will be hereafter referred to as Mann, and W. C. Crenshaw & Company, Incorporated, as Crenshaw.

In June, 1930, Mann instituted, by notice of motion for judgment, his action in the Law and Equity Court of the city of Richmond, Part Two, against Crenshaw seeking to recover $2,358.00 which he claims to be due to him from the defendant on account of the ten cars of lettuce. Mann contends that Crenshaw guaranteed to him on each car a minimum net return of $1.15 per crate plus $25.00 per car for top icing and lining car with paper; making an aggregate of $393.00 per car; that Crenshaw has paid him the minimum guaranteed return on four cars, aggregating $1,572.00, but has refused to pay him the minimum guaranteed return, or any sum, on six of the cars, aggregating $2,358.00; and that Crenshaw now owes him this sum.

Crenshaw pleaded the general issue and a special plea of set-off. No grounds of defense were called for or filed.

The special plea filed by Crenshaw alleges:

"At and before the times of the shipment of the lettuce in question the plaintiff entered into an agreement with the defendant to ship said cars of lettuce to it, the defendant, upon consignment, the said lettuce to be of such quality and condition as to 'top all market,' the said consignment being upon condition that for such quality lettuce the defendant was to pay a guaranteed advance of one dollar and fifteen cents ($1.15) per crate and to make returns to the plaintiff after the sale of the lettuce for any difference that the lettuce would be sold for, less the commissions and expenses of said defendant in the handling of said lettuce.

"The said plaintiff failed to comply with the agreement

in that the lettuce instead of being of a quality and condition 'to top all markets' was of an inferior quality, bad condition, rotten and decayed and because thereof the defendant, instead of realizing the top market price for said lettuce, was compelled to, and did, sell the lettuce for less than the prevailing market price for lettuce of the kind and condition represented by the plaintiff."

The advances made by Crenshaw to Mann by the payment of four drafts drawn by Mann exceeded by $737.71 the net proceeds of all ten cars; and, therefore, Mann is indebted to Crenshaw for $737.71, for which judgment is prayed.

On the witness stand, however, Mr. W. C. Crenshaw testified that the correct amount claimed by Crenshaw to be due to it from Mann was $699.65.

Mann made a general replication to the special plea.

The verdict of the jury was: "We the jury on issue joined find for the defendant damages in the sum of $699.65;" upon which verdict the court entered judgment. To this judgment a writ of error has been allowed to Mann.

All communication between Mann and Crenshaw relating to the shipment and handling of these cars was by telegrams, except one letter dated January 7, 1927; and the agreement between the parties relative to the consignment of these cars is to be found in these telegrams.

The negotiations between the parties were opened by Crenshaw who, on December 30, 1926, telegraphed Mann: "Our iceberg market two seventy-five three dollars * * * would like handle your account here again this season. To which Mann replied by letter dated January 7, 1927:

"GENTLEMEN:

"Relative to your day letter of the 30th ult. regarding out lettuce in your market, * * * we are not making any consignment deals on this commodity.

"If you should desire to purchase * * * believe you

should be able to secure a premium on our lettuce as we are very careful in the grading and packing and make an effort to have our lettuce bring a premium on the eastern markets, which will enable our customers to earn a good profit on their purchases from us."

Between January 7th and 28th Crenshaw sent a number of telegrams to Mann quoting prices on fancy iceberg lettuce, and soliciting a shipment on consignment, to none of which Mann replied.

Beginning with January 28th the following telegrams passed between the parties in the order below given:

Crenshaw to Mann, January 28, 1927: "Fancy iceberg sold here today three fifty prospects good advise."

Mann to Crenshaw, January 31, 1927: "Appreciate your wire market information however we selling fob only quote liberty lettuce dollar thirty-five California acceptance know you can do well with our brand in your market in having constant supply our lettuce we shipping daily eastern connections their requirements. All report satisfaction plus. We bill cars open understanding drafts paid presentation should think this deal appeal yourselves."

Crenshaw to Mann, February 1, 1927, 12:36 P. M.: "Answering order get started will pay your draft guaranteed advance dollar ten crate benefit market on car or two one today one tomorrow heavy fours as possible this deal ought appeal to you answer."

Mann to Crenshaw, February 1, 1927: "Appreciate your wire willing place consignment couple cars our liberty brand basis dollar fifteen guarantee plus top ice paper charges twenty-five dollars having no trouble getting dollar forty today as our lettuce being packed to top all markets if you can give us real service quick returns and willing make reasonable guarantees can give you good supply throughout deal answer quick as can give you car loading late tonight."

(Note: The evidence shows that "fours" means crates packed with lettuce of such size that four dozen heads fill standard crate, and "fives" means crates packed with lettuce of such size that five dozen heads fill standard crate.)

Crenshaw to Mann, February 1, 1927, 3:10 P. M.: "Answering all right will guarantee dollar fifteen promise you real service quick returns advise."

Cars 29334 and 36277 were shipped pursuant to above telegrams on February 1st and 4th, respectively. Both parties agree that in response to telegraphic communications between them the other eight cars were shipped by Mann to Crenshaw upon the "same basis" as the first two; but some of the telegraphic communications relative to the shipment of these eight cars are pertinent to the question, what was that basis?

Cars 24898 and 19029 were shipped in response to telegrams from Crenshaw to Mann dated February 2nd, and cars 29975 and 27294 in response to telegrams from Crenshaw dated February 7th; but these telegrams throw no light upon the terms of the agreement between the parties.

On February 9th Mann telegraphed Crenshaw relative to car to be shipped that day (No. 27294): "Market advancing here today's price our liberty today dollar half account handling for growers we don't want take too much risk ourselves same time keep you supplied desire today's car be guaranteed advance dollar quarter plus top icing papering advise quick."

But that night Mann telegraphed Crenshaw advising that car 27294 had been shipped, and saying: "It is satisfactory dollar fifteen this car as were able handle growers this basis."

To these messages Crenshaw replied February 10th: "Answering dollar fifteen enough guarantee we think."

On the night of February 10th, Mann telegraphed Crenshaw: "Able ship couple more cars dollar fifteen guarantee Friday and Saturday."

To which Crenshaw replied on February 11th: "Answering let car come Friday one Saturday."

In advising of the shipment of cars Mann gave the number of "fours" and the number of "fives" in the car; and in several telegrams Crenshaw had asked for more "fours." On February 11th Mann telegraphed Crenshaw: "Shipped today Pacific 2208 sizes 70 fours 250 fives expect larger sizes next week however please understand our pack of fives are put up with the thought they must be right in every respect and it is on our pack that we are able secure premium in eastern markets."

On February 14th Crenshaw telegraphed Mann that it was willing to take two more cars if he could ship cars running 100 crates or less "fives," adding, "fives don't go well with this trade here."

To which Mann replied the same day: "Answering sizes now running generally to fives where tight pack made regular size crates used expect have some lettuce running around 130 fours balance fives Wednesday and Thursday altho soon fours will practically disappear for couple weeks heavy rains this afternoon delay much movement couple days please advise promptly."

In reply to this telegram Crenshaw telegraphed Mann on February 16th to ship one car on 16th and to ship another on the 17th; but asked him to "try load heavier fours." In response to these telegrams Mann shipped car 538 on the 16th and car 33283 on the 17th, which was the last car shipped.

The dates of shipment and arrival at Richmond (or Greensboro for cars 29334 and 538), lapse of time between shipment and arrival, and dates of sale were as follows:

| Car No. | Shipped | Arrived | Days to Rich'd. | Inspected | Sold |
|---------|---------|---------|-----------------|-----------|------|
| 29334 | Feb. 1 | Feb. 13 | 12 | Feb. 13 | Feb. 13 |
| 36277 | Feb. 4 | Feb. 16 | 12 | Feb. 16 | Feb. 17 |
| 24898 | Feb. 5 | Feb. 18 | 13 | Feb. 18 | See below |
| 19029 | Feb. 5 | Feb. 18 | 13 | Feb. 18 | Feb. 18 |
| 29975 | Feb. 8 | Feb. 22 | 14 | Feb. 23 | See below |
| 27294 | Feb. 9 | Feb. 23 | 14 | Feb. 23 | About Mch. 1 |
| 2208 | Feb. 11 | Feb. 24 | 13 | Feb. 25 | See below |
| 15789 | Feb. 12 | Feb. 27 | 15 | Feb. 28 | About Mch. 7 |
| 538 | Feb. 16 | Mch. 1 | 15 | Mch. 1 | Mch. 1 |
| 33283 | Feb. 17 | Feb. 26 | 9 | Feb. 28 | See below |

Cars 29334 and 538 were sold while en route to Anderson and Company of Greensboro, North Carolina, and stopped there.

The date of sale of car 24898 is not given; but though this car arrived at Richmond on February 18th, it was not released to the railroad until March 10th.

Cars 29975 and 27294 lay in Richmond from February 23rd to February 26th, and were then diverted by Crenshaw to Baltimore to Zimmerman to be sold on consignment. They arrived at Baltimore on March 1st. Car 29975 was refused by Zimmerman on account of the quality and condition of the lettuce, was sold by the railroad company for freight, and failed to bring enough to pay freight charges by $271.72.

Car 27294 was sold by Zimmerman on or about March 1st at $2.00 per crate, which he testifies was the best price he could get, though at that time he was getting on the average of $3.00 per crate for iceberg lettuce.

The date of the sale of car 2208 is not given. But while this car arrived at Richmond on February 24th, it was not released to the railroad company until March 8th; and when

sold $35.00 demurrage charges had accrued against Crenshaw, which were paid by him and charged to Mann.

Cars 15789 and 33283 lay in Richmond until March 1st. On that date these two cars were diverted by Crenshaw to Baltimore. Car 33283 was diverted direct to Baltimore. Car 15789 was diverted first to Washington and then to Baltimore. Both lay in Baltimore until March 5th, when Crenshaw diverted car 15789 to Philadelphia and car 33283 to Jersey City, both being consigned to A. S. Cohen and Company for sale on consignment.

Car 33283 arrived at Jersey City on March 6th, was refused by Cohen on account of the condition of the lettuce, was sold by the railroad company for freight, and failed to bring freight charges by $373.57.

Car 15789 was sold by Cohen and Company between March 7th and 12th in Philadelphia at a gross price of $494.50 (sixty-two crates at $2.00, thirty at $1.75, 180 at $1.50 and forty-eight at $1.00).

The uncontradicted evidence introduced by Crenshaw shows that there are four grades of lettuce known to and generally recognized by the trade, which are in descending order "U. S. Fancy," "U. S. No. 1," "U. S. No. 2," and "Unclassified." The specifications for the three U. S. grades are those prescribed by the United States Department of Agriculture. All lettuce not conforming to the specifications of one or the other of these grades is denominated "Unclassified."

While the witnesses introduced by Mann do not in specific terms classify the lettuce shipped by Mann to Crenshaw, their evidence is to the effect that the grade of lettuce shipped by Mann to Crenshaw in each of the ten cars fell within the specifications of "U. S. No. 1."

On the other hand, Crenshaw introduced as witnesses the persons who saw and inspected the eight cars which arrived at Richmond. All these witnesses testify that the

lettuce in none of these eight cars was up to the requirements of grade "U. S. No. 2;" and that the lettuce in all eight cars was what is known to the trade as unclassified. Pearman testified that "U. S. Fancy" is seldom quoted, and that the grade generally quoted is "U. S. No. 1;" but adds: "U. S. Fancy is the kind of grade that brings the premium, tops the market, something a little better than U. S. No. 1."

The witnesses introduced by Crenshaw who saw and inspected cars 29334 and 538 which were shipped and sold at Greensboro, North Carolina, testify as follows with reference to these two cars: Car 29334 was in good, sound, merchantable condition, except that it showed a little sunburn. It had no decay and no injury from freezing. It was about on the average for cars of iceberg lettuce with the exception of the sunburn. Though the refrigeration in car 538 was good, about twenty-five per cent of the lettuce in this car had started to decay. About one-third of the car had to be repacked, and about thirty crates thrown away as a total loss. The effect of the testimony as to car 538 is that when it arrived at Greensboro it could not be graded otherwise than as unclassified.

Crenshaw sold the two cars stopped en route at Greensboro before he had any knowledge of the grade of the contents of the cars: They were sold at $2.75 per crate, while Crenshaw had been quoting to Mann prices on Richmond market for fancy iceberg lettuce at from $3.00 to $3.50. No reduction was claimed by Anderson and Company on purchase of the first car. After inspection of the second car Crenshaw made an allowance to Anderson and Company of twenty-five cents per crate, because of the inferior quality and bad condition of the lettuce.

The witnesses introduced by Mann testified that they saw and inspected all these cars before they were shipped; that they were all properly iced for shipment to eastern markets,

with ice in the crates; that a layer of chunk ice about four and a half inches thick (6,000 pounds) was put on top of the crates after they were packed in the car; and that the cars were paper lined and all plugs, hatches and ventilators properly closed.

Mann testifies that lettuce shipped in cars so iced "should remain in good marketable condition eleven to twelve days."

On the other hand, witnesses Pearman and Crenshaw testify that a car of lettuce of good grade, iced as testified to by Mann, should keep in good condition about three weeks; and upon arrival in Richmond from California would still have, Crenshaw says, 4,500 pounds of ice over the top. Pearman says it would arrive with 2,000 pounds of ice over the top. They both testify that a lettuce will not keep in a car with only 500, 600, or even 1,200 pounds of ice over the top.

The inspection reports on cars 29334 and 538 have been above indicated. So far as refrigeration was concerned both cars arrived with good refrigeration.

The eight cars which arrived at Richmond were inspected by N. J. Furlong, inspector of the Moorehead Inspection Bureau. His reports, introduced in evidence by Crenshaw, show that the temperature of the lettuce in six of these cars was at top of car forty-two degrees and at bottom of car forty degrees; that in car 15789 top was forty degrees, bottom thirty-eight degrees; and that in car 29975 top was forty-four degrees and bottom forty-two degrees.

The pertinent parts of Inspector Furlong's reports on the "contents and condition" of these cars are as follows:

Inspection report (Furlong) car 36277, February 16th: "Iceberg head lettuce packed in iced oil paper lined crates."

* * * Estimate 750 pounds chunk ice over top of load. Lettuce shows eighty-five per cent well headed to head, ten per cent partly firm and five per cent loose and

light; thirty-five per cent tip burn affecting outer leaves only. Stumps rusted. Free from bursted heads. An occasional head affected by soft, slimy rot. No freeze injury."

Inspection report (Furlong) car 24898, February 18th: "Iceberg lettuce packed in iced oiled paper lined crates. Lettuce shows as follows: Seventy to seventy-five per cent hard to firm, twenty-five per cent fairly firm, five per cent loose and wasty; thirty to thirty-five per cent tip burn affecting outer leaves only; three to five per cent bursted heads. Stumps rusted; two per cent soft, slimy rot. No freeze injury." No comment on top icing of car is made.

Inspection report (Furlong) car 19029, February 18th: "Iceberg head lettuce packed in iced oiled paper lined crates. * * * Approximately 750 pounds chunk ice over top of load, quality and condition generally good, showing seventy per cent firm, thirty per cent fairly firm, thirty to thirty-five per cent tip burned affecting outer waste leaves only. Good, crisp, clean stock. Stumps rusted. Free from all forms of soft rot. No freeze injury."

Inspection report (Furlong) car 29975, February 23rd: "320 crates iceberg head lettuce, Geo. E. Mann, brand Liberty, packed in standard iced oil paper lined crates. * * * Lettuce shows sixty-five to seventy per cent firm, balance fairly firm to loose and poorly headed; twenty to twenty-five per cent tip burn affecting outer waste leaves only. Waste leaves show good green color with five per cent yellowing. No decay. No freeze injury. No ice over top of load."

This car which arrived with no ice overhead, but with no decay, was permitted to lie on the tracks in Richmond until February 26th, and then reshipped to Baltimore to Zimmerman, where it arrived on March 1st. No charge is made by Crenshaw against Mann for re-icing it. Crenshaw's witness Pearman says that if it was re-iced, it was at Crenshaw's cost, as the railroad does not re-ice such cars.

Zimmerman, who was put on the stand by Crenshaw, testifies that he saw the car on or about March 1st; that it was "well headed with outer leaves showing considerable decay and slime," and that the "condition I saw was from age." Zimmerman refused the car on account of its condition and it was sold by the railroad for freight charges, which it failed to bring by $271.72.

Car 27294 was inspected February 23rd by Inspector Furlong and Inspector Lee. The pertinent parts of their reports are as follows:

Inspection report (Furlong) car 27294: "320 crates iceberg head lettuce, packed in iced oil paper lined crates. * * * California head lettuce Liberty brand eighty-five per cent firm to hard, fifteen per cent fairly firm to loose, twenty to twenty-five per cent tip burn affecting outer leaves only. Stumps fresh, no decay. No freeze injury. 500 pounds chunk ice over top load."

Inspection report (Lee) car 27294: "About 500 pounds of ice over top of the load. California lettuce packed in standard, paper lined crates. Ice in center of crates. Iceberg lettuce. Quality and grade good to fair, small to medium sized, mostly firm, about fifteen per cent fairly firm, well headed, mostly clean and bright; twenty-five to thirty per cent show two to three outer leaves affected with tip burn. No decay noted."

This car lay in Richmond until February 26th, when it was reshipped by Crenshaw to Zimmerman in Baltimore, Mr. Crenshaw in his testimony says, "because we couldn't find sale for it in Richmond." This car arrived with only 500 pounds of top ice, while Crenshaw testifies it should have arrived with much more top ice. No charge is made by Crenshaw for re-icing the car.

Inspection report (Furlong) car 2206, February 25th: "320 crates of California head lettuce packed in standard iced oil paper lined crates. Liberty brand. Quality and

condition good; eighty-five per cent firm, ten per cent fairly firm, five per cent light and loose; twenty-five to thirty-five per cent slight tip burn affecting outer waste leaves only. Balance bright and clean. Stumps rusted. * * * No decay, no freeze injury. * * * 200 pounds chunk ice on top load."

This car (2206), which arrived February 25th with only 200 pounds top ice, remained on the tracks unsold until $35.00 demurrage had accrued against it and was then sold; but there is no charge made by Crenshaw against Mann for re-icing it, nor does it appear from the evidence that any steps were taken by Crenshaw to protect the lettuce from deterioration while awaiting sale.

Inspection report (Furlong) car 15789, February 28th: "Liberty brand iceberg head lettuce packed in standard oil paper lined, iced crates. * * * 600 pounds chunk ice over top of load. Lettuce shows fair as to quality and condition running eighty per cent firm, ten per cent fairly firm, ten per cent light and loose; thirty-five to forty per cent of heads showing outer waste leaves slightly tip burned, stumps rusted, indicating age, no decay, no freeze injury."

This car, which arrived at Richmond February 28th, was opened and inspected, and then reshipped to Baltimore and then to Philadelphia, where it arrived March 7th. No charge is made by Crenshaw for re-icing the car. When the car arrived in Philadelphia it was inspected by Inspector Binney, the pertinent parts of whose report, introduced by Crenshaw, reads:

"Bottom of right door has no insulation on it—does not fit tight. * * * Lightly iced over top of load. Top layer crates lightly iced in packs, other layers no ice. * * * Temp. Commodity: Top forty-nine degrees, bottom forty-five degrees, outdoors forty-seven degrees. * * * quality, description, etc: * * * medium weight, five per cent light weight spongy. Generally dull, mellow, overripe

condition. Considerable outer loose leaves, fair trim. Outer leaves badly rusted, eight to twelve bursted heads per pack in four dozens. Poor quality. * * * Grade: U. S. Unclassified. Decay: Door facings badly slimy three to five wrappers deep; top layer slimy one to two wrappers; balance lading two to three wrappers; leaves burnt black; twelve to twenty-five decay. Originally frozen over door facings, now thawed out and into slime decay; * * * weak shipment, requires prompt disposition; * * * twelve broken and mashed recoopered, four crates worthless and decayed thrown back in car."

Weiner, who looked at this car and car 33283 while they were in Baltimore, says of both cars: "The lettuce was muddy, had dirt on them; they showed tip burn, decayed foliage, and also the heads were not well headed."

This car (15789) was sold by A. S. Cohen and Company at various prices per crate (sixty-two at $2.00, thirty at $1.75, 180 at $1.50, and forty-eight at $1.00), the gross return being $494.50. They paid freight to Baltimore $495.16, additional freight $32.63, inspection and sampling and delivery charges $8.00, charged commission $34.61, and on March 12th billed Crenshaw for the loss on the car $76.10.

Inspection report (Furlong) car 33283: "Iceberg head lettuce in crates. No ice over load or in pack. * * * Lettuce shows seventy-five per cent firm, twenty per cent fairly firm, five per cent loose and poorly headed; forty per cent of heads show outer leaves affected by slight tip burn; * * * free from soft rot; four crates in doorway show from four to eight heads per crate with outer leaves decaying due to rubbing against door of car."

This car was reshipped by Crenshaw on March 1st to Washington then to Baltimore, and then, on March 5th, to Jersey City, where it arrived March 6th. It was refused by Cohen and Company, to whom it had been consigned by

Crenshaw, on account of the quality and condition of the lettuce. No charge is made by Crenshaw for re-icing the car.

Speaking with reference to this car and car 15789, Weiner, the agent of Cohen and Company, who saw these cars first in Baltimore and then this car in Jersey City, says: "The quality of the lettuce was poor. It showed tip burn, decay. It was full of sand, and the sand ate the lettuce right up. Some of the lettuce had split."

Cohen and Company refused the car and it was sold by the railroad company for freight charges California to Richmond, Richmond to Washington, Washington to Baltimore, and Baltimore to Jersey City. The gross sale price failed to pay freight charges by $373.54. The record does not show gross amount received by the railroad or total amount of freight charges; but freight charges California to Richmond were $444.60.

The only testimony which tends in the remotest degree to show that Crenshaw re-iced any of the cars received by him or took any steps to preserve the lettuce pending disposition thereof is this testimony on cross-examination of Crenshaw's employee, Pearman, who was introduced by Crenshaw:

"Q. Now take that car * * * 29975, that car was a car you diverted * * * after it remained on the tracks here for four days. Now when you diverted those cars did you re-ice?

"A. These particular cars I don't remember whether they were re-iced or not; but it was our practice to re-ice it when we diverted them and I am pretty sure they were re-iced, the way we attended to it when we diverted these cars.

"Q. If you re-iced you would have made a re-icing charge, wouldn't you?

"A. No, sir.

"Q. You wouldn't?

"A. No, sir. Who would we make it against? We couldn't sell them on this market on account of the condition and sent them to other markets to be handled to the best possible advantage. They wouldn't have paid any drafts.

"Q. If you were receiving them on consignment why wouldn't you charge that back to the consignor?

"A. I don't know that it wasn't done. I haven't got those records. Mr. Crenshaw can tell you whether they were charged back or not. I know the railroad doesn't attend to re-icing the top of lettuce. You have to do that yourself and the ice companies charge you.

A recapitulation of the sales, receipts, freight deductions (including demurrage), and deductions for commissions, drayage and other charges, and net proceeds, or loss, on these ten cars is as follows:

| Car No. | Price Per Crate | Gross Return | Freight Paid | Commission Drayage & Charges | Net Return | Loss |
|---|---|---|---|---|---|---|
| 29334 | $2.75 | $880.00 | $445.60 | $61.60 | $ 372.80 | |
| 36277 | 2.25 | 720.00 | 444.60 | 50.40 | 225.00 | |
| 24898 | 2.25 | 720.00 | 444.60 | 65.40 | 210.00 | |
| 19029 | 2.25 | 720.00 | 444.60 | 65.40 | 210.00 | |
| 29975 | Sold by | railroad in | Baltimore for freight | | | $271.72 |
| 27294 | 2.00 | 640.00 | 496.16 | 44.80 | 99.04 | |
| 2208 | 2.25 | 720.00 | 479.60 | 65.40 | 175.00 | |
| 15789 | | 494.50 | 527.99 | 42.61 | | 76.10 |
| 538 | 2.50 | 800.00 | 445.60 | 32.00 | 322.40 | |
| 33283 | Sold by | railroad in | Jersey | City for freight | | 393.57 |
| | | | | Totals | $1,614.24 | $741.39 |
| | | Total net returns from all ten cars | | | | 872.85 |
| | | | | | | $1,614.24 |

Crenshaw paid the four drafts for $393.00 each drawn by Mann against cars 29334, 36277, 538 and 19029, making a total of $1,572.00. Mr. Crenshaw testifies that these drafts

on cars arriving at Richmond were not paid until after Crenshaw had examined the car.

Deducting the net return above shown for all ten cars ($872.85) from the total amount of Mann's drafts paid by Crenshaw ($1,572.00) leaves a balance of $699.15, by which amount Crenshaw claims he has overpaid Mann. The jury's verdict was for $699.65. The unexplained difference of fifty cents seems to be due to an error in addition or subtraction.

The three cars which were sold for less than freight charges and the car for which the smallest net return was gotten (car 27294) were all cars which Crenshaw reshipped to markets further north at increased freight charges and without re-icing them, though the testimony of the witnesses introduced by Crenshaw shows that they had no ice over the top or were not properly iced for further shipment. Pearman's testimony is wholly insufficient to show that these cars were re-iced; and the failure of Crenshaw to make any charge for re-icing and the condition of the cars when they arrived at destinations to which they were reshipped warrant and require the inference that they were not re-iced.

The place to which each of the four cars was reshipped, the number of days elapsing between date of inspection at Richmond and date of sale, the increased freight charges by reason of reshipment, and the net return or net loss are as follows:

| Car | Reshipped to | Days from Inspection to Sale | Increased Freight Charge | Net Return | Net Loss |
|---|---|---|---|---|---|
| 29975 | Baltimore | 7 or more | $51.50 | | $271.72 |
| 27294 | Baltimore | 7 or more | 51.50 | $99.04 | |
| 15789 | Philadelphia | 8 or more | 83.39 | | 76.10 |
| 33282 | Jersey City | 7 or more | 83.39 at least | | 393.57 |
| | | Totals | $269.78 | $99.04 | $741.59 |

Though Mann had, on February 13th, 16th and 17th, telegraphed Crenshaw asking that he be advised of the prices being gotten for cars sold, Crenshaw had made no reply; nor had Crenshaw paid several of the drafts drawn by Mann against cars shipped. On February 18th Mann telegraphed Crenshaw asking him to pay the drafts drawn against cars 24898, 19029 and 2208, which his bank advised him had not been paid. To this telegram Mann received no reply. On February 20th Mann sent this night letter to Crenshaw: "Please answer our Friday's night letter reference payment drafts referred therein also prices securing our lettuce understood at time make arrangements with you intended keep us fully posted on sales and prompt returns. * * * Awaiting reply stating gross sales on various cars sold."

To this telegram Crenshaw replied on February 21st, 12:15 P. M.: "First car in sold two seventy-five we paying all drafts fast as cars arrive· stop receipts quite liberal however look for market clean up quickly."

At the time this message of February 21st was sent four cars had been received and inspected, three of them had been sold, the price at which the second two were sold being fifty cents per crate less than the first car sold. Yet Crenshaw only advised Mann of the price received for the first car. No reason is to be found in the record for so misleading a telegram. It is to be further noted that he makes no complaint in this message of either the grade or condition of the lettuce shipped in these four cars, nor of the icing of the cars. The evidence further shows that no report was made by Crenshaw to Mann until after March 25th of either the gross or net returns of any of the other nine cars, though Mann on February 26th, March 2nd and March 3rd asked for this information in his telegrams of those dates.

On February 22nd Mann telegraphed Crenshaw asking

whether he could handle other cars on the "same basis" for him. To this message Crenshaw replied on the 23rd: "Glad handle for you; no advances on fives."

On February 26th, Crenshaw wired Mann: "What about car lettuce out today."

To which Mann replied offering to ship two cars "good quality mostly fives  *  *  *  same basis previous cars," and asking for telegraphic report on cars sold. To this message Mann received no reply.

Following this the following telegraphic communications, which is all the communication had between them from February 28th to March 25th, passed between the parties:

Mann to Crenshaw, February 28th, 7:22 A. M.: "We want work with you on our lettuce and very anxious conditions improve permitting you make some guarantee advances on few cars as previously as we handling for growers and not much margin for us at prices we rolled you lettuce we will show some losses if your market fails to show us liberal surplus on each car."

Crenshaw to Mann, February 28th, 3:21, P. M.: "Our market two quarter to half prospects cleaning up and something out today should do well advise please."

At this time seven of the ten cars had been received and inspected by Crenshaw; and the reasonable inference is that Crenshaw was quoting prices on Richmond market of grade of lettuce he had been receiving from Mann. Yet only two days before Crenshaw had reshipped cars 27294 and 29975 to Baltimore, the inspection reports of which on arrival in Richmond seem to show were of about the same grade as the other cars which had been received prior to that time. No mention is made of the fact that any cars received up to that time were below grade or in bad condition.

Crenshaw to Mann, March 2nd: "What's wrong your lettuce last four cars arrived bad order tip burn and decay also no ice don't look like ice ever been put in crates suicide ship quality like this."

This telegram, sent four days after the last of the ten cars had arrived and at least six days after the first car therein referred to had arrived, was the first intimation given Mann by Crenshaw that any of the lettuce received by him was not of satisfactory grade or was not arriving in good condition. It further refers only to the last four cars shipped.

Crenshaw to Mann, March 2nd, 7:22 A. M.: "Get us off car lettuce today sure one tomorrow stop you not putting enough ice in crates also on top try remedy this."

Mann to Crenshaw, night letter, March 2nd: "Answering growers holding lettuce for market increase you causing us little trouble in not reporting sales on each car as sold as places us in wrong with growers as they want to know what's doing also bank advises drafts out too long unpaid please advise last draft you paid so can satisfy bank as they expecting immediate payment."

Mann to Crenshaw, night letter, March 4th: "Answering your wire second our lettuce has given satisfaction every market receiving same and as to ice we know how to pack lettuce and know what ice required stop we want our drafts paid promptly in accordance with arrangement and want know what each car has grossed that you have sold please wire immediately."

Mann to Crenshaw, March 24th: "Our bank advise you have refused payment and returned drafts following cars Pacific 24898 Pacific 29975 Pacific 27294 Pacific 2208 Pacific 15789 and Pacific 11975 period these drafts were drawn in accordance with arrangement with you and unless we receive immediate wire you are forwarding your check for $2,358.00 we will bring suit immediately you can consider this wire demand for payment and don't expect us spare any time in protecting our interests."

Crenshaw to Mann, March 25th: "Answering we did not guarantee payments your drafts on rotten lettuce as

previously reported to you some this stock came through in nine ten days arriving without any ice in car or crate could not have been much put in cars stop also all your wires reported fancy stock as good as any shipped can prove this worse stock any brand rec'd this market this year couple cars entirely worthless sales mailed."

This is the first intimation given by Crenshaw to Mann that the grade or condition of any of the cars shipped (other than the last four) was not satisfactory or that the first six cars had arrived not in good condition.

It is further to be noted that at no time did Crenshaw advise Mann that he was having trouble in disposing of this lettuce in Richmond, or was finding it necessary or expedient to reship to other markets and incur additional freight charges, or ask any advice from Mann as to the disposition of cars received; and that even after he had found that he had reshipped some of them to Baltimore, he was still urging Mann to ship other cars to Richmond.

Cars 36277, 24898 and 2208 were sold by Crenshaw to Timberlake and Currie, a corporation. The evidence shows that Mr. W. C. Crenshaw who handled the sale of these cars for W. C. Crenshaw and Company, Inc., is a stockholder and director in both of these corporations. But there is no evidence which shows that these cars were sold below the market for the grade of lettuce they contained, or that they could have been sold to better advantage to any other person or corporation.

Mann, in testifying in chief in his own behalf, testified that the words, "pay your draft guaranteed advance dollar ten crate benefit market," as used in the telegram from Crenshaw to Mann dated February 1, 1927, and other telegrams passing between them, have a special significance in the ordinary course of business dealings between persons or firms engaged in this line of business; and mean that the commission merchant guarantees to the shipper a mini-

mum net return on each car of lettuce shipped, agrees to pay the draft of the shipper drawn for the amount of the minimum guarantee upon presentation after the car against which it is drawn has been shipped, and also, if the net proceeds of the car exceed the minimum guarantee, to pay the shipper the difference.

Crenshaw introduced witnesses Pearman and W. C. Crenshaw, who, over the objection of Mann, were permitted to testify that these words (guaranteed advance) as used in these telegrams had a well defined and definite meaning in the lettuce trade throughout the United States; and what that meaning is. The effect of their testimony is this: These words do not mean that the commission merchant guarantees the shipper a minimum net return on each car of lettuce shipped. They mean that the commission merchant guarantees that he will make an advance to the shipper of the named amount on each car by paying shipper's draft drawn for that amount by the shipper when a car has been shipped. The payment of the draft is only an advance on account; and if the car against which the draft was drawn does not bring a sum which, after paying freight, commissions and cost of handling and sale, is equal to or larger than the amount of the draft paid, the shipper is obligated to repay to the commission merchant the difference.

The first assignment of error is that the court erred in admitting the testimony of Pearman and Crenshaw as to the meaning of the words, "guaranteed advance."

The second assignment of error is that the court erred in not giving instruction No. 1 offered by Mann. This instruction, in effect, told the jury that the telegrams introduced in evidence contained the contract between the parties; and that the agreement between the parties was that Mann agreed to ship these ten cars of lettuce to Crenshaw to be sold upon consignment, and that Crenshaw agreed to sell them for Mann and guaranteed that Mann

should receive a net minimum return on each car of $1.15 per crate plus $25.00 for top icing and papering car.

The court did not err in either of these respects. Mann had testified that these words as used in the telegrams have "a special significance in the ordinary course of business" of persons engaged in this trade; that is, have a technical meaning in this trade, and had testified as to what that meaning was. Crenshaw's witnesses agreed with Mann that these words have a well defined technical meaning in this trade *throughout the United States;* but they disagreed with him as to what was that meaning. Crenshaw was entitled to have them testify as to what was the technical meaning of these words; and the question, what was the meaning of the words as used in this trade, was a question for submission to the jury. Elliott on Contracts, sections 1707, 1723; *Richlands Co.* v. *Hiltebeitel,* 92 Va. 91, 22 S. E. 806; *Rastetter* v. *Reynolds,* 160 Ind. 133, 66 N. E. 612; *Walker* v. *Gateway Milling Co.,* 121 Va. 217, 92 S. E. 826.

The contention of Mann that the testimony of Pearman and W. C. Crenshaw on this point is inherently improbable and unworthy of belief, has no apparent basis other than that it conflicts with the testimony of Mann himself.

The third assignment of error is that the court erred in refusing instruction No. 7 asked for by Mann. The instruction was properly refused. It states abstract principles of law without in any way applying them to the facts in the case; and could only have tended to confuse the jury. *Hawkins, etc.* v. *Edwards,* 117 Va. 311, 84 S. E. 634. Further, the evidence on the point to which it is directed is not such as to warrant the giving of such an instruction in this case.

The fourth assignment of error is that the court refused to give instruction No. 2 offered by Mann. This instruction in effect told the jury that the representation

of Mann that "our lettuce being packed to top all markets" refers to grade of the lettuce when loaded in California; and that if it should find that the lettuce when loaded in California came up to the requirements of grade "U. S. No. 1," then in determining the other questions at issue between the parties they should consider the lettuce as being of the grade contemplated by the parties.

The court did not err in refusing this instruction. This was clearly a shipment, on consignment to be sold at Richmond, Virginia, not a sale of lettuce to Crenshaw f.o.b. cars California. The shipper was responsible for the condition of the lettuce upon arrival at Richmond, and the grade was to be determined as of place and time of delivery there, not as of time of loading in California. Further than this the representation of Mann was that he was shipping lettuce "packed to top all markets," not that he was shipping lettuce of grade "U. S. No. 1."

The fifth, sixth and seventh assignments of error are that the court erred in refusing to give instructions No. 3, No. 4 and No. 5 offered by Mann. These instructions were properly refused, because, among other reasons, they assume as matters of law that the agreement between the parties was that Crenshaw guaranteed to Mann a minimum net return on each car shipped; and that the telegraphic communication between the parties related to the shipment of lettuce of grade "U. S. No. 1."

The eighth assignment of error is that the court refused to give instruction No. 6 asked for by Mann. The court did not err in refusing this instruction, because, among other reasons, it imposes upon Crenshaw the duty "to handle and dispose of the lettuce at the best possible advantage." Crenshaw's duty was to use ordinary care to get for the lettuce shipped to it the best price obtainable. This was true whether there was a guarantee of a net minimum return or not.

The court having refused to give any of the instructions asked for by Mann, and any asked for by Crenshaw, if any were asked for by it, gave the jury the following instruction:

"The court instructs the jury they are to determine from all the evidence what was the contract between the parties.

"The contract is to be found in the writings which passed between the parties and their conduct in dealing with the subject matter of the contract.

"Wherever in their dealings with each other words or expressions were used which were peculiar to that class of business and not otherwise clear and free from ambiguity, the jury may give heed to all credible evidence before them as to just what such word or expression meant according to the usage or custom of trade in that particular class of business.

"If the lettuce did not come up to representation there was no obligation upon W. C. Crenshaw and Company, Inc., to do more than use ordinary care to dispose of it to the best advantage for George E. Mann and Company. If in doing so Crenshaw incurred proper expenses in excess of what the lettuce brought, Crenshaw would be entitled to recover such excess he has paid out or become bound for.

"If the lettuce did measure up to representations and you further believe from the evidence that it was to be sold for the benefit of George E. Mann and Company without any absolute guaranty of price, then the duty upon Crenshaw was to exercise ordinary care to get the best price obtainable for the benefit of George E. Mann and Company, and after deducting proper costs and charges, to remit the balance to George E. Mann and Company. If in doing so Crenshaw expended properly more than the lettuce brought, Crenshaw is entitled to recover of George E. Mann and Company such excess.

"On the other hand, if you believe from the evidence the

lettuce measured up to representations and the agreement between the parties was an absolute guaranty of a certain price regardless of the market, then you should bring in a verdict for George T. Mann and Company, a verdict for the net amount due him on the basis of such absolute price so guaranteed."

The first ground of objection made to the court's instruction is that it does not tell the jury that the telegrams in evidence proved a contract by Crenshaw and Mann in which Crenshaw guaranteed to Mann a minimum net return on these ten cars. The second objection is that it told the jury that if the lettuce did not come up to Mann's representations, Crenshaw owed only the duty to use ordinary care in disposing of it. For reasons above stated, these objections are not well taken.

. [5] The next ground of objection is that it "excluded from the jury the question whether or not the defendant waived the grade requirements" of the agreement between the parties. This objection appears to be predicated upon a misconception of the evidence. The first car to arrive in Richmond was car 36277, on February 16th, and Crenshaw was notified of its arrival at 11:05 A. M. on that day. At that time Crenshaw had ordered the shipment of nine of the ten cars. Eight had been shipped prior to that date, and the ninth was shipped on that day. At 3:55 P. M. on that day Crenshaw sent its telegram authorizing the shipment of the tenth car, which was shipped on the 17th. While car 36277 was inspected by Inspector Furlong sometime after 11:05 A. M. on the 16th, the evidence does not show the hour of the inspection or that Crenshaw had received the inspector's report or knew the grade or condition of the lettuce in this car at the time its message was sent at 3:15 P. M.; and there is no evidence tending to show that Crenshaw at this time had any knowledge that the lettuce in car 29334, which had been stopped and sold

in Greensboro, did not come up to the grade which Mann represented he was shipping, even though it be a fact that it did not. Though the course of action pursued by Crenshaw may be of evidential value as to what grade of lettuce Crenshaw understood Mann was to ship, the evidence is insufficient to establish a waiver of grade requirements by Crenshaw.

The next objection to the instruction is that it "excluded from the jury the question * * * whether the defendant discharged the duty resting upon it as agent to deal with the plaintiff, its principal, in the interest of good faith." The instruction does not "exclude" the consideration of this question by the jury; and the objection is not well made further than it is comprehended in the next objection.

The last objection made to the instruction is that it "totally ignored plaintiff's theory of the case, and submitted the case to the jury upon a partial view of the evidence." It does not totally ignore plaintiff's theory of the case; but it does submit the case upon a partial view of the evidence.

The material questions relating to five of the cars shipped are materially different from those of the other five. The instruction as given treats the issues of the case as though the issues were the same as to all the cars shipped; certainly it fails to take any cognizance of the fact that as to some of the cars they are materially different from those relating to other cars.

The undisputed evidence introduced by Crenshaw was that Crenshaw sold car No. 29334 to Anderson and Company, Greensboro, North Carolina, while it was en route, at $2.75; and that this price was paid for the car without objection by Anderson and Company when it arrived. Therefore, Crenshaw could have suffered no damage on account of the shipment of inferior lettuce in this car, if indeed it was of an inferior grade; and, if the contract between the parties was for a guaranteed minimum return

per car, Mann was entitled to receive the guaranteed mini-
mum on this car, even though the lettuce in the other nine
cars was of a grade inferior to that contemplated by the
agreement between the parties.

The agreement between the parties was for the consign-
ment of these ten cars to Crenshaw at Richmond, and there
was no suggestion in their correspondence that Crenshaw
was selling in any other market. Without authority ex-
press or implied from Mann, Crenshaw assumed the authority
to reship two of these cars to Baltimore, one to Phila-
delphia, and one to Jersey City, for sale at these points by
other commission merchants. In so doing Crenshaw in-
curred additional freight charges aggregating $269.78 and
very materially delayed the possible time of sale of a very
perishable product. They were all reshipped before Mann
was advised by Crenshaw that any of the cars had arrived
in bad condition, or that there was any claim by Crenshaw
that any of the cars did not come up to the grade contem-
plated by the agreement between the parties, and without
consulting Mann with reference to the disposition of them,
though this could have been done and a reply received within
a few hours.

The evidence introduced by Crenshaw shows that
when these four cars were received, they were not properly
iced to preserve the lettuce, and therefore required quick
sale of the lettuce unless proper steps were taken to re-ice
or otherwise preserve the lettuce; and that this fact was
known to Crenshaw. The evidence further shows, or at
least warrants the inference, that these cars were reshipped
without re-icing them; and that when these cars arrived at
the destinations to which they were reshipped, the lettuce
in each of them was in materially worse condition than
when it was received by Crenshaw from seven to eight
days before.

The instruction given by the court ignores these

very material phases of the evidence in this case. The court having undertaken to give its own instruction covering the whole case, should have, either in this or some other instruction, instructed the jury on these phases of the evidence. An instruction which undertakes to cover the whole case, but omits an essential view of the case is erroneous. *Sun Life Assur. Co.* v. *Bailey,* 101 Va. 443, 44 S. E. 692; *Pocahontas, etc., Co.* v. *Hairston,* 117 Va. 118, 83 S. E. 1041; *Atlantic Coast Line R. Co.* v. *Newton,* 118 Va. 222, 87, S. E. 618; *Atlantic Coast Line R. Co.* v. *Caple,* 110 Va. 514, 66 S. E. 855; *Hatton* v. *Mountford,* 105 Va. 96, 52 S. E. 847.

■ ■ "In the absence of special instructions or a usage to the contrary, it is presumed that the goods are to be sold at the place to which they are shipped and where the factor has his place of business or maintains an agency, and it is his duty to sell them at that place or market; and since the principal selects the market he assumes the risk of the factor being unable by the exercise of ordinary care, skill, and diligence to make a sale there. If the factor, in such a case, reships the goods he will be liable for the loss incurred from selling at a less price than he could have obtained in the market where he had authority to sell." 25 C. J. (Factors) section 48; see, also, 11 R. C. L. (Factors) page 768, section 22; *Weidner* v. *Olibit,* 108 App. Div. 122, 96 N. Y. S. 37, judgment affirmed 188 N. Y. 611, 81 N. E. 1178; *Glantz* v. *Freedman,* 100 Cal. App. 611, 280 Pac. 704.

■ "It is the duty of the factor to inform the principal of all facts or circumstances relating to the consignment, which may make it necessary for the principal to take measures for the protection of his interests, and the factor will be liable to his principal for any loss that may result from his failure to discharge such duty." 25 C. J. (Factors) section 43.

■ "It is the factor's duty to care for and protect the goods which have been consigned to him, with a reasonable

degree of prudence and diligence, that is, such care as a reasonably prudent man would take of his own property in a similar situation. * * * Where the factor fails to exercise reasonable prudence and diligence in caring for the goods, he is liable for any loss or injury that results therefrom." 25 C. J. (Factors) section 44.

■ The last assignment of error is that the court erred in not setting aside the verdict because it was contrary to the law and the evidence. This assignment of error is well made. Crenshaw has failed to establish its right to recover any sum from Mann.

■ Ordinarily, where the principal relies upon the negligence of the factor, or other breach of duty by the factor, as a ground of recovery, the burden is on the principle to establish the negligence or breach of duty and that he has been damaged thereby. It will not be presumed, in the absence of proof, either that the factor was negligent or breached his duty, or that the principal has suffered damage thereby. 25 C. J. (Factors) section 121. But this is not so in the instant case.

■ Under its plea of set-off, the factor is here seeking to recover from his principal sums which he claims to have expended for his principal over and above the sum received from the sale of the produce consigned to him. The evidence introduced by the factor shows that the factor has breached his duty to his principal by reshipping four cars of the lettuce consigned to him at Richmond to other markets to be sold by other factors, without consulting the principal; that in so doing he incurred large additional freight charges; that these cars did not arrive at the places to which they were reshipped by the factor until seven to eight days after they were received by the factor; that when these cars arrived at the destinations to which they were reshipped, the lettuce in each car was in materially worse condition than when received by the factor; and that the prices received for the shipped cars were very materially less than

that received for cars of like quantity of lettuce of very similar grade which were sold by the factor in Richmond about the same time these cars were received by him. The evidence further shows, or warrants the inference, that the factor reshipped these cars of lettuce, which is highly perishable, without re-icing them, though he knew that the cars were not properly iced to protect the lettuce from deterioration.

In such a case the burden rests upon the factor to prove that the principal has not suffered any damage by reason of his breach of duty and negligence, or that after allowing the principal for all the damage suffered by him by reason of such breach of duty and negligence, the principal is still indebted to the factor. This burden Crenshaw has not borne.

The judgment of the court must be reversed for the reasons above stated; and upon a consideration of the whole record we think that the ends of justice will be best served by remanding the case for a new trial on all issues.

It is impossible to tell from the verdict of the jury whether the verdict was predicated upon a finding that there was no guarantee of a minimum net return per car, or that none of the cars of lettuce shipped was up to grade, or upon a finding that both of these things were true. If there was a guarantee of a minimum net return on each car, Crenshaw was not under the evidence entitled to recover anything on account of car 29334 sold in Greensboro, even if the lettuce shipped was not up to grade. Although the lettuce shipped may not have been up to the grade contemplated and there may have been no guarantee of a minimum return, there is evidence sufficient, under proper instructions as to the duties of Crenshaw relative to the four cars reshipped by it, to support a verdict for the recovery of damages by Mann against Crenshaw on the four cars reshipped.

*Reversed and remanded for a new trail upon all issues.*